THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT HENRY LOWER, Defendant-Appellant.

Second District   No. 75-527

■

Opinion filed December 16, 1977.

William A. Kelly, Public Defender, of Galena (Ralph Ruebner and Michael Mulder, Assistant Public Defenders, of counsel), for appellant.

Victor V. Sprengelmeyer, State's Attorney, of Galena (Phyllis J. Perko and Robert J. Anderson, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant was charged in a three-count indictment with murder by strangulation while committing aggravated kidnapping and indecent liberties with a child. He waived trial by jury and was found guilty on all three counts and sentenced to serve not less than 100 nor more than 150 years imprisonment in the penitentiary.

The defendant appeals on the grounds (1) that the court erred in not suppressing his inculpatory statement as being the product of a warrantless arrest made without probable cause; (2) that the State's evidence failed to show that the defendant's statement to the police was the voluntary product of his free choice and that the consent to search his residence and automobile was voluntary, and (3) that the State failed to

prove beyond a reasonable doubt that the defendant was legally sane at the time of the offense.

A brief discussion of the background and immediate circumstances of this tragic and bizarre case is necessary before considering the issues raised in this appeal.

On March 4, 1975, Joseph Didier, 15 years old, disappeared while delivering his morning paper route in the City of Rockford. His paperbag was found on the ground along the uncompleted route and the police began an immediate and intensive investigation, suspecting that he had been abducted while delivering his papers.

Rockford police files contained a record of several previous incidents of paperboys being molested while delivering their early morning routes. On February 3, 1973, Scott Lewis, aged 12, had been assaulted while delivering his morning papers by a man who struck him, took him two blocks away to a church, took off his clothes, and spray painted his groin area. Lewis described the man to the police as wearing a gold snowmobile suit with a face cover. On that same date, another paperboy, Richard Hankins, was followed persistently for several blocks while delivering his papers but managed to elude the man who was following him. This man was also dressed in a snowmobile suit, but no color of the suit was given by Hankins in his initial report to the police. On April 12, 1974, Bruce Hagen, a paperboy, was abducted by a man while delivering his morning route. Hagen said the man jumped from behind a bush, placed a hood over his head and put him into the trunk of an automobile. He was then taken to a cemetery and suspended from a tree by ropes. He was then disrobed and tied to a post where he was sexually abused and then was forced to run in circles at the end of a rope which was tied to his wrist. He was left tied to the post with his face covered until he freed himself sometime later. His genitals were also painted. The police, quite logically, connecting the three previous incidents involving paperboys during early morning hours with the disappearance of young Didier, began an intensive search and investigation centered on persons with a record of deviate sexual conduct. All such suspects, however, were released as not being connected with the incident in question. On March 15, 1975, the nude body of Joseph Didier was found in a cabin at the Apple River Boy Scout Camp between Stockton and Rockford. Death had been by strangulation and there were evidences of rope burns on the wrists and evidence of sexual molestation.

On the theory that the crime may have been committed by a person who did not live in the immediate neighborhood of Didier's paper route, but who had reason to travel to Rockford and who was also familiar with the location of the Apple River Boy Scout Camp, the police thought a truck driver, traveling between Stockton and Rockford, might be

involved. In the course of the investigation the name of the defendant was mentioned by the plant superintendent of a manufacturing plant in Stockton, as being a truck driver whose route ran between Stockton and Rockford. Upon his name being run through the police computer files, the name of the defendant was disclosed in connection with a case of child molestation. This record was in the Freeport police files and upon further review of the files in Freeport it was discovered that the defendant, Lower, while a member of the Army Air Force, had been arrested in Sparks, Nevada, in 1958, for kidnapping and abusing a young boy. The circumstances were similar to the Hagen and Didier cases in that in the Nevada case the victim was bound by ropes and dragged in a sleeping bag in circles and in the Hagen case the boy had been forced to run in a circle at the end of a rope and had been suspended from a tree. The rope burns on young Didier's wrists showed that he probably had been suspended by ropes around his wrists.

The Freeport police records also indicated that in 1964 the defendant had been involved in a sexual incident in Freeport with a young boy as the result of which he had been committed to Menard Psychiatric Center and in the police files there was a letter from Doctor Graybill (later a witness for the defense in the Didier trial) describing the defendant as a sexually dangerous person. The Freeport police files indicated certain bizarre conduct with the young boy in question involving tying him up with ropes and a simulated hanging.

The county sheriff had also received information from a motorist, previous to defendant's arrest by the Rockford police, that he (the motorist) had observed an automobile parked at the entrance to the Boy Scout Camp, subsequent to Didier's disappearance. The motorist identified the car as probably being a 1968-69 or 1970 Dodge Charger or Roadrunner, which description the police were aware corresponded to the car owned by the defendant. Although the defense contends otherwise, both County Detective Samual Sheehan and Sheriff Specht testified that this information was related to the Rockford police immediately, and prior to the arrest of the defendant.

The police also knew that Lower had an interest in scouting as he had once applied for a position as a scoutmaster or assistant scoutmaster and had been turned down because of his sexual record. They were also aware of Lower's interest in snowmobiling and that the boy scout camp area was used by snowmobilers and the police, therefore, had cause to believe that the defendant was familiar with the scene of the crime because this scout camp was located on this truck route between Stockton and Rockford.

Prior to the arrest, the Rockford police had received a telephone call from a private citizen—Mrs. Timms—suggesting that a man by the name

of Lower be investigated in connection with the Didier case because this man had shown an abnormal interest in her son. Perhaps the most damning piece of evidence pointing to the defendant's guilt, however, was his identification from a composite photo, by young Hankins, the boy who had been persistently followed by a man in a snowmobile suit in the early hours of February 3, 1973. Hankins, according to the police, on the morning of March 21, prior to the arrest, unhesitatingly picked out the defendant's photo from a group of five photos as being the person most resembling the man who followed him on that morning. While such identification could not be regarded as conclusive in view of the length of time which had elapsed and the fact that it was a composite photo, it was a strong indication of probable cause for Lower's arrest.

Sergeant Francis of the Rockford Police Department testified that on the basis of all the information the police had accumulated concerning Lower, they decided on March 21, 1975, to arrest and question him concerning the Didier boy's death, when he left work that afternoon. Sergeant Francis stated that he and the detectives who accompanied him had positioned their squad car so as to intercept the defendant, possibly as much as two hours before Lower's anticipated departure from work. The police did not have an arrest warrant and Sergeant Francis explained that the usual practice was not to obtain a warrant where a serious crime was under investigation and the evidence was only circumstantial, but, nevertheless was of such a nature as to justify questioning the suspect before charging him with such a serious crime.

The defendant was intercepted as he left work and was arrested and taken to the Rockford police station where he was given his *Miranda* warnings. Sergeant Francis testified that the defendant was not told at that time that he was being charged with any particular crime but when he asked the defendant whether he knew what they wanted to talk to him about, Lower asked, "Is it about the Didier boy?" and that within a few minutes after that he began to tell the police the details of the crime. The statements made by the defendant were then condensed into written form and signed by the defendant, relating in detail the circumstances of the crime. There was no indication in the record, nor any contention made by the defendant, that the confession was in any way obtained by threats, intimidation or physical abuse. While under arrest, the defendant was asked if he would consent to a search of his automobile and lodging and he signed a form giving such consent.

We have set forth the circumstances leading to the arrest of the defendant in great detail because the defendant has challenged his trial and conviction as being the fruit of an invalid arrest made without probable cause. It is against the background of the facts related above

that the question of probable cause to arrest the defendant without a warrant must be decided.

■■ While warrantless arrests are not favored under Illinois law, except in exigent circumstances, the Code of Criminal Procedure of 1963 provides that such an arrest is not invalid when the police officer "* * * has reasonable grounds to believe that the person is committing or has committed an offense." Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).

The defendant makes much of the fact that the police deliberately failed to obtain a warrant when they had at least two hours to do so while awaiting the defendant's departure from his place of employment. Considering the gravity of the charge and the information known to the police, which except for Hankins' identification, was purely circumstantial, we do not find it strange that the police decided that they should question the defendant before seeking a formal arrest warrant. The police had pursued many leads which had proved fruitless, prior to the defendant's arrest, and they may be commended rather than condemned for their conduct under the circumstances.

■■ Here, we believe that prudent police policy justified an arrest for questioning without the issuance of a formal warrant and its attendant publicity before giving the defendant a chance to explain away the evidence pertaining to his possible guilt. The criterion here is not that required for conviction, but as stated by the supreme court in *People v. Clay* (1973), 55 Ill. 2d 501, 504-05:

> "Whether or not probable cause for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest was made. [Citations.] In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. [Citations.]" 55 Ill. 2d 501, 504-05.

■■ While the defense cites good authority for the position that warrantless arrests are not tolerated, except in special circumstances which did not exist here (see *United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820; *Beck v. Ohio* (1964), 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223), the general language of these cases is not controlling as to the particular case before us and does not gainsay the practical approach indicated in the *Clay* case cited above. The three previous incidents involving newsboys strongly suggested a connection with the Didier case and reasonable grounds for believing that the defendant might be acting out a pattern of deviate sexual conduct. We agree with the trial court's ruling that the Rockford police did not act

improperly in their warrantless arrest of the defendant, considering the totality of the circumstances.

■■ In his second ground of appeal the defendant attacks the validity of the consent to search his automobile and his residence, contending that the consent to do so, without a search warrant, was not voluntary because it was given while the defendant was under arrest and detained in police custody and that he had not been advised that he had a right to refuse his consent. The defendant's argument suggests that his confession was not truly a product of his free will, because once he had been induced to give his consent to the search he had no choice but to confess because of the gold snowmobile suit which would necessarily be found in his possession. We see little merit in this argument. In the first place, it appears to us to be based on hindsight, rather than on the actual situation existing at the time of the defendant's confession. The consent to search was given prior to the confession and the confession was made, according to police testimony, only a few minutes after defendant was taken to the police interrogation room for questioning. There is nothing in the record to suggest that the police mentioned a gold snowmobile suit to the defendant, prior to his confession, and it is farfetched to suppose that with all the other guilty knowledge in his mind the defendant was induced to admit the crime because he realized a gold snowmobile suit would inevitably be found in his possession. The police already knew he was a snowmobile enthusiast—he could hardly have supposed that they were unaware of that—and would therefore possess a snowmobile suit. However, in an area such as Rockford where snowmobiling is common, it must be taken for granted that there was a great many snowmobile suits about and the color was not, therefore, significant. We cannot believe that a man with the guilty knowledge in his mind, revealed by the defendant's prompt confession, would have remained silent except that he knew the police had unfairly induced him to reveal the fact that he owned a gold snowmobile suit. This was a small link, indeed, in a long chain of circumstances preceding his conviction, and was certainly not so materially a factor as to render his confession or his consent to the search inadmissible. We do not think it necessary here to attempt to distinguish the cases in which the consent was given while under restraint from those where the defendant had not yet been arrested (see *United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820), nor do we consider the significance of the omission to warn the defendant of his right to refuse (see discussion in *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041), because we do not consider that the mere possibility of the gold snowmobile suit being found was a significant factor in inducing the defendant's confession. Moreover, had the defendant been able to dispose of the suit before the police found it

in his possession, we have no doubt the result of the trial would have been the same. We find no reversible error on that score.

We come finally to the defense of insanity—specifically that while the defendant may have known right from wrong, and have been competent in the sense that he could assist defense counsel in his own defense—he was the victim of a psychotic disorder which made it impossible for him to conform his conduct to the requirements of law. Defense witness, Dr. Graybill, testified on this point as follows:

> "I think I testified previously that Mr. Lower did have some concept of what was right and what was wrong but that he lacks substantial capability to conform his actions to the requirements of the law because of the underlying illness which he suffers."

Dr. Hamann, for the State, testified on the other hand that while his examination of the defendant and his previous experience with him in 1966 disclosed that the defendant was not schizophrenic, and while he had a tendency to act out bizarre sexual fantasies, he was not psychotic in the sense of not being capable of conforming his actions to the requirements of law. To a hypothetical question setting out the details of the murder and his opinion of the defendant's legal sanity, Dr. Hamann replied that in his opinion the defendant "did have the capacity" to appreciate the criminality of his conduct and "that he could conform to the requirements of law."

The experts opinions were thus evenly divided. A careful perusal of the defendant's written confession, however, gives a definite clue to the question of whether or not the impulse to kill the Didier boy was irresistible, by reason of insanity. However irresistible may have been the impulse to kidnap the boy, the reason for killing him is clearly set forth in the confession as a deliberate and rational act. In the course of his confession, after detailing the incidents previous to the actual hanging of the boy, the defendant stated that he then tied the boy to a bench, with a rope around his neck. He continues:

> "I told him that I would be back in a few minutes and I went out of the cabin.
>
> I then walked down towards the swimming pool, and I was thinking of what I was going to do. I decided that I would have to kill him because if I didn't, he would go back and tell and he would be able to identify me. I walked around for at least a half hour and then made up my mind that I would kill him."

The narrative confession then goes on to relate how the defendant arranged a bench under the boy, with him standing on it, so that when he attached a rope to the bench and pulled it out from under the boy, that he would be strangled by the rope around his neck.

■■ We can hardly conceive of a more deliberate and cold-blooded

killing. Lower admits he killed the boy to prevent his identification and not because of a blind impulse which by reasons of insanity he was unable to resist. While Dr. Graybill expressed the opinion that in thus ascribing his motive for killing the boy to a fear of being identified and caught, the defendant was rationalizing after a long reflection and that he actually acted at the moment from an impulse beyond his control, we are not impressed by this argument, in view of the cold-blooded language of the confession itself. Even if the original deviate conduct in kidnapping and sexually molesting the boy came from an irresistible impulse—which we do not concede—the murder of the young Didier boy by strangulation was clearly deliberate and done for a reason not related to the defendant's mental illness, but rather for the defendant's protection from punishment by society. We therefore find no merit in the insanity defense.

We find no error in the record and we therefore affirm the judgment of the circuit court of Jo Daviess County.

Judgment affirmed.

BOYLE and WOODWARD, JJ., concur.