THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* BRUCE THOMAS, Defendant-Appellee.

Third District   No. 79-256

Opinion filed February 7, 1980.

1122

Edward Petka, State's Attorney, of Joliet (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, and Bart Markese, Assistant State's Attorney, of counsel), for the People.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellee.

Mr. JUSTICE STENGEL delivered the opinion of the court:

This is an appeal by the People of the State of Illinois (hereinafter State) from a ruling by the trial court suppressing statements made by the defendant, Bruce Thomas, to Joliet police officers. The evidence presented at the hearing on the motion to suppress established the following facts.

During the afternoon of October 12, 1978, the Joliet police department was notified by the DeKalb police department that an armed robbery had occurred at a service station in DeKalb. The DeKalb police department informed the Joliet police department that Gregory Austin of 309 Park Road, Joliet, was a suspect in the armed robbery and that the vehicle involved in the armed robbery was identified as a black-over-blue Chevrolet Malibu.

Detective Stewart, of the Joliet police department, checked the arrest records maintained by the department and ascertained that Gregory Austin was previously arrested on September 10, 1978, for the unlawful use of weapons. The police report of the incident indicated that the defendant was arrested with Austin and that the weapon involved was

a sawed-off shotgun. The report also indicated that both men resided at 309 Park Road, Joliet, and that the defendant drove a 1970 green-over-green Pontiac Firebird.

Stewart then obtained photographs of Austin and the defendant. The photograph of Austin appeared similar to the depiction of a suspect in a Frankfort, Illinois, armed robbery, and the photograph of the defendant appeared similar to an artist's sketch of a suspect in four Palatine armed robberies. At this time, Stewart was aware of several armed robberies in the Palatine-Joliet area that involved a sawed-off shotgun. Other Joliet police officers were informed of the results of Stewart's investigation.

Between 8 and 10 p.m. on the same day, officers from the DeKalb police department arrived in Joliet to assist in the apprehension of Greg Austin. Several other Joliet officers had already been dispatched to various areas in the city of Joliet to look for Greg Austin. Shortly after the DeKalb police arrived at the Joliet police station, a black-over-blue Malibu was observed in a driveway at 309 Park Road. Upon receiving this information, Sergeant Robert Kelly, Detective Stewart and the DeKalb police proceeded to 309 Park Road, where Sergeant Kelly observed that the Malibu had a license-applied-for sticker in the windshield which bore the name of Greg Austin.

One of the arresting officers, Richard Baum, testified that Detective Stewart had instructed him to look for a green Pontiac Firebird. Baum was given the license plate number of the vehicle and was informed that about a month prior to October 12, 1978, a sawed-off shotgun had been found in the Pontiac. Other than this fact, Baum had no information that the green Pontiac was involved in an armed robbery.

Before leaving the police station, Baum was apprised of the message from the DeKalb police department, including the description of the black-over-blue Malibu involved in the DeKalb armed robbery and the fact that Greg Austin was named in that message. Also prior to leaving the station, Baum looked at the photograph of Greg Austin and was thus familiar with Austin's appearance.

After leaving the station, Baum received a radio transmission instructing him to go to the area of Washington Street and Park Road, approximately two blocks from the address of 309 South Park Road. Baum parked his squad car in a gas station driveway at Washington and Park Road. There, he observed two Will County sheriff's cars and noticed the officers were having difficulty finding a house that they were assigned to check out. Baum followed the county officers, pulled up behind them and gave them directions to the correct location. As Baum was giving them advice, the green Pontiac Firebird, described earlier by Detective Stewart, drove by. Baum informed the county officers that this was the

suspect vehicle and the two Will County officers and Baum pursued the green Pontiac, stopping it about three blocks away.

With weapons drawn, Baum and the Will County officers ordered the occupants of the Firebird to get out of the car. The car contained two occupants, who after they stepped out of the car, were ordered up against the side of the car and were pat searched. The defendant, who had been the driver of the car, was handcuffed, as was Austin.

A short time later, Sergeant Kelly, Detective Stewart, and the DeKalb police officers arrived at the scene. One of the DeKalb officers indicated that they wanted only Austin and the defendant's handcuffs were removed. However, Sergeant Kelly then asked the defendant to accompany him to the police station. This was done for the purpose of questioning only, the police admitting they had no knowledge of any crime committed by the defendant. The defendant agreed to do so and rode to the station with Sergeant Kelly and Detective Stewart. The defendant was not handcuffed. The police officers testified that the defendant was not under arrest at this time.

At the police station, the defendant was questioned by Sergeant Kelly. He was asked if he knew anything about Austin's plan to commit the armed robbery in DeKalb. The defendant replied that he had no prior knowledge of the DeKalb armed robbery. Defendant was then asked if he was with Austin the last time. The defendant hung his head and replied that he had been with him. Sergeant Kelly then advised the defendant of his *Miranda* rights, and the defendant indicated that he understood them. The defendant then admitted to his involvement in the August 5, 1978, armed robbery of a Clark station in Joliet.

On October 13, 1978, at about 9 a.m., the defendant was again interviewed by Detectives Gerdes and Pesavente. The detectives advised the defendant of his *Miranda* rights, and he again indicated that he understood them. The interview occurred in the interview room of the county jail. The defendant again admitted his involvement in the August 5, 1978, armed robbery of the Clark station.

Based on these facts, the trial court suppressed the defendant's statements. The trial court, after finding that this defendant was under arrest at the time of the confessions and that no probable cause existed to arrest the defendant, reasoned that the initial questioning was so close in time to the illegal arrest as to be tainted thereby and that there was insufficient change in circumstances to remove from the second confession the taint resulting from the illegal arrest.

In this appeal, the State does not argue that the defendant was not under arrest at the time he made the statements. Instead, the State raises the issues of whether there was probable cause for the arrest and whether, even if the arrest was unlawful, the defendant's second statement was sufficiently attenuated from the arrest to be admissible.

● ▆ If a peace officer has reasonable grounds to believe that a person is committing or has committed a criminal offense, as determined by the knowledge and information possessed by the peace officer at the time of the arrest, the peace officer has probable cause to make a warrantless arrest of the suspect. (*People v. Coleman* (1977), 63 Ill. App. 3d 814, 364 N.E.2d 742.) Although an objective analysis of the situation confronting the officer is the standard generally used, a court can not ignore an acknowledgement by the police officer that the arrest was based merely on suspicion. (*People v. Roberts* (1971), 2 Ill. App. 3d 927, 274 N.E.2d 688.) A general description alone is insufficient to provide probable cause (*In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606), as is mere association with a person the peace officer does have probable cause to arrest. *People v. Galloway* (1956), 7 Ill. 2d 527, 131 N.E.2d 474; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.

▆ The facts known to Sergeant Kelly at the time of the defendant's arrest were that a person fitting the defendant's description had committed four armed robberies in Palatine, several armed robberies had occurred in the area in which sawed-off shotguns were involved, the defendant had previously been arrested with Austin for the unlawful use of a sawed-off shotgun, and the defendant was presently in the company of Austin. However, there was testimony to the effect that the defendant was taken to the police station only for questioning, the police admittedly having no knowledge of any crime committed by the defendant. This admission is consistent with the fact that the defendant's handcuffs were removed. The police officers testified that the defendant was not under arrest when he was taken in for questioning, but the assistant State's Attorney conceded that he had been arrested at that time.

The facts in this case indicate that the police had no more than a suspicion of criminal involvement on the part of the defendant. We agree with the trial court that probable cause to arrest the defendant did not exist.

The State argues that *People v. Lower* (1977), 55 Ill. App. 3d 1014, 370 N.E.2d 1278, is a factually similar case in which probable cause was found. We cannot agree. In *Lower*, a victim of another attack had identified the defendant as the perpetrator from a composite picture. Since there was probable cause to arrest Lower for one criminal offense, his subsequent confession to another could not be invalidated for lack of probable cause to make the arrest.

The law pertaining to whether an incriminating statement is sufficiently attenuated from an unlawful arrest has been discussed by Illinois courts.

> "The courts in this state, in accord with the majority view, have ruled that the illegality of an arrest will not ipso facto render infirm statements made by the accused subsequent to his arrest, thus

requiring their automatic suppression from evidence at trial. (*People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356; *In re Tucker* (1974), 20 Ill. App. 3d 377; *In re Lamb* (1974), 21 Ill. App. 3d 827.) Moreover the United States Supreme Court has directed that we need not characterize all evidence to be fruit of the poisonous tree

> ' * * * simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." '

(*Wong Sun v. United States* (1963), 371 U.S. 471, 488.) The court has further held that purgation of the taint can be established by a showing that the challenged evidence had been obtained from an independent source (see *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385) or that the connection between the lawless conduct of the police and the discovery of the challenged evidence had become so attenuated as to dissipate the primary illegality. See *Nardone v. United States* (1939), 308 U.S. 338.

> * * * Once an arrest is shown to be illegal, a confession following the arrest shall be presumed to be the product of that illegality, with the State bearing the burden of establishing a purgation of the illegality on the basis of the *Wong Sun* doctrine. [Citations.]" (*People v. Riszowski* (1974), 22 Ill. App. 3d 741, 746-47, 318 N.E.2d 10, 14-15.)

More recently, the United States Supreme Court has again addressed this problem.

To determine, in protecting the defendant's fourth amendment's right, whether a confession is a product of a free will, the facts of each case must be searched to discover factors, such as whether *Miranda* warnings were given, the temporal proximity of the confession to the arrest, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct, which reflect on the question of whether the confession was obtained as a result of officials exploiting an unconstitutional arrest. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) In *Brown*, a first statement was made within two hours of arrest and a second statement was made about five hours after the initial statement. The second statement was found to be the result of the first since the making of the first statement, which Brown believed to be admissible, vitiated any incentive Brown had to avoid self-incrimination.

Based on *Brown*, a similar result was reached in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. In *Dunaway*, the defendant made a first statement within one hour of the illegal arrest and a second, more complete, statement the following day, which was also determined to be the result of the first statement. The first statement was not sufficiently attenuated from the unconstitutional arrest to be admissible. We find no significant factual distinctions between *Brown*, *Dunaway* and the case at bar.

Here, the State does not contend that the defendant's first statement was not tainted by the unlawful arrest. But the State does cite two cases which are said to be factually similar to the present case to support the proposition that the second statement is admissible. However, in neither *People v. Gabbard* (1979), 67 Ill. App. 3d 945, 385 N.E.2d 366, nor *People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752, was there an initial statement made within a short time of the unlawful arrest. The only statements made in those cases were not made in close temporal proximity to the arrest. In the case at bar, there was an initial statement which the State, once the arrest was determined to be unlawful, does not contend to have been admissible, and that earlier statement creates serious doubt that the second statement was made as a result of free will.

Accordingly, the order of the Circuit Court of Will County suppressing the defendant's incriminatory statement is affirmed.

Affirmed.

BARRY and SCOTT, JJ., concur.