THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ISIDRO G. GALLARDO, Defendant-Appellant.

First District (5th Division)   No. 81—1033

Opinion filed February 4, 1983.

Steven Clark and Bruce Mosbacher, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Stoioff, and James Klein, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:
After a jury trial, defendant was convicted of murder and sentenced to a term of 60 years. He contends on appeal that (1) he did not receive effective assistance of counsel; (2) he was denied a fair trial when the jury was given an unintelligible instruction on voluntary manslaughter, and the court, outside the presence of defendant or his counsel, failed to answer the jury's question on this issue; and (3) the trial court abused its discretion in sentencing him to an extended term of 60 years.

At a pretrial hearing on defendant's motion to suppress his statements as involuntarily made, police officers testified that they approached defendant in Witort's Tavern at approximately 5:30 p.m. on June 26, 1980, and after identifying themselves as police officers, said they wanted to talk to him; that he was told he was not under arrest, but they did not tell him he was not required to accompany them; that he was taken to the Melrose Park police station along with Guillermo Castillo, another suspect, for investigation; that defendant spoke some English, but when he indicated a desire for a Spanish interpreter, questioning ceased until the interpreter arrived; that the interpreter, after participating in the questioning of Castillo, met with defendant at approximately 10 p.m. and, speaking Spanish, identified

himself as a police officer; that he read *Miranda* warnings to defendant in Spanish, which defendant acknowledged he understood; that defendant then agreed to make an oral statement in which he admitted killing the victim; that defendant was not physically or mentally coerced, was allowed food and drink, did not appear to be intoxicated, and received no promises of leniency; that his responses to questions were appropriate, and the interpreter had no difficulty communicating with him; that defendant signed a waiver of his *Miranda* rights which, although written in English, was orally translated into Spanish; that he then wrote out a statement in Spanish and later made a further oral statement to Assistant State's Attorney Speh after again being informed, in Spanish, of his *Miranda* rights and stating that he understood them; that he acknowledged his written statement to Speh but, when asked to tape record a statement, he declined and requested a lawyer—at which point all questioning ceased; and that, during this time, defendant was not free to leave, although he was not informed that he was under arrest until after he made the first oral statement.

Defendant testified that he was intoxicated when the police picked him up at Witort's Tavern, and he therefore did not remember most of what happened at the police station; that the interpreter did not identify himself as a police officer and spoke broken Spanish which was difficult to understand; that he was never read his rights and, although he said from the beginning that he wanted to speak to a lawyer, none was provided; and that he was physically abused before making his statement.

The motion to suppress was denied and, at the subsequent trial, Chris Kempf testified that he left the Anchor Inn Tavern (the tavern) between 1 and 1:30 a.m. on June 26, 1980; that the only other person present at that time was the bartender, Frank Turso; and that the tavern was equipped with a system which prevented entry unless someone on the inside pressed a buzzer.

Harold Sziviski, owner of the tavern, testified that he arrived at approximately 3:15 a.m. to check the cash receipts; that as he approached he noticed that the outside lights were turned off but the interior lights, usually extinguished at closing, were still burning; that he looked through a window and saw several stools overturned and Turso lying face down in a pool of blood; that he entered the tavern but could not remember whether the door was locked; that $340 and a box of Puffs facial tissues were missing from the bar, but the safe, normally left unlocked, was locked and the handle was covered with blood; and that, when the safe was later opened, the night's receipts

were inside.

Castillo testified that when defendant came to his apartment at the Broadway Main Hotel between 2 and 3 a.m. on June 26, 1980, he had a cut on one hand and explained that a black man beat him up and robbed him; that later that day defendant's hand was bandaged, and he cautioned him (Castillo) not to talk about the injury; and that he (Castillo) had told all of this to the police.

While testimony of police officers was essentially the same as that presented at the pretrial hearing, they added that upon their arrival at the tavern, they noted signs of a struggle with blood all over and traces of hair and human tissue on the base of a metal coat rack; that the following afternoon they noticed a trail of blood which led across the street to the Broadway Main Hotel and up to Castillo's apartment, where they found blood on the door; that after talking to Castillo, who had no visible signs of injury, they began searching for defendant and found him at Witort's Tavern, where they identified themselves to defendant as police officers and asked him to step outside; that when they inquired about the bandage on his hand, he explained that he cut his hand on some broken glass at Witort's the previous evening; that an immediate check with the bartender at Witort's failed to corroborate this explanation, and he was taken to the police station where, after waiving his *Miranda* rights, he told the officers that he left Witort's at approximately 1:30 a.m. on the night in question and went to a friend's home, but this story was denied by the friend; that in searching defendant's apartment, they found a shirt, a box of Puffs facial tissues, and a brown paper bag—all blood-stained—behind the refrigerator; and that there were bloodstains on the pants and shoes defendant wore at the time of his arrest.

Dr. Tae An, Assistant Cook County Medical Examiner, testified that the victim was 63 years old, five feet three inches tall, and weighed 130 pounds; that he had multiple lacerations on his scalp, temple, face and neck, multiple skull fractures, and four fractured ribs; that, in his opinion, the injuries were inflicted by no less than two blows of considerable force with a blunt instrument; and that the cause of death was cerebral injury due to skull fracture and hemorrhaging.

Officer Galvan testified that, while he was acting as interpreter, defendant related in an oral statement that on the night in question, after he left Witort's with a six-pack of beer, a black man confronted him and, thinking that the man had a weapon, he looked around and saw the victim standing in the doorway of a tavern; that the victim called out, "Hey, Mexican, come here," and he ran to him; that as he

entered the tavern, the victim grabbed him with one arm and put his other hand in his (the victim's) pocket; that he (defendant) then pulled a knife and threw the victim to the floor; that when the victim got up, he threw him to the floor again and struck him three or four times with a barstool; that he cut his hand in the struggle and went to Castillo's to wash his wound, telling Castillo he had a fight with a black man.

Abiel Gonsalez, an official court interpreter, translated the statement written in Spanish by defendant, which related substantially the same events, except that defendant stated he killed the victim because he (defendant) thought the victim was reaching for a knife when he put his hand in his pocket.

Defendant testified that he was 25 years old; that he had been drinking heavily on the night in question and left Witort's Tavern at approximately 1:30 a.m.; that when a black man approached him and tried to steal his beer, he looked around and saw the victim who called him over; that as soon as he entered the tavern, the victim grabbed him; that he struck the victim with his fist, then with a bottle; that the victim grabbed him again, and he (defendant) hit him twice with a chair, causing him to fall; that when he left immediately thereafter, the victim was alive and trying to get up from the floor; that the only injury he (defendant) received was a $1/2$-inch cut on his right hand; that he went to Castillo's apartment and told him about the black man and about the fight in the tavern; that he did not hit the victim hard enough to kill him; and that he was afraid the victim was reaching for a switchblade or a small gun when he put his hand in his pocket.

OPINION

Defendant first contends that he was denied effective assistance of counsel. He supports his position by alleging that his appointed counsel failed to move to suppress his statements as fruits of an illegal arrest; failed to argue to the jury or request an instruction on the theory of self-defense; and told the jury that defendant had the burden of raising a reasonable doubt. The State responds that the record, when considered as a whole, reflects the competency of defense counsel. It further argues that the motion to suppress would have been futile; that the question of what defenses to raise is a question of trial tactics and therefore not subject to review; and that defendant has failed to show any prejudice in his counsel's statement of what the evidence would show.

An accused has the right to effective assistance of counsel in

State criminal proceedings pursuant to the sixth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VI, XIV; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 362 N.E.2d 681), but effective assistance means competent, not perfect, representation (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64); therefore, we will not require counsel to do a futile act (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677) nor extend our review to areas involving the exercise of judgment, trial tactics, or strategy, even where appellate counsel or this court might have acted differently (*People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017), and we will consider the totality of the circumstances in determining the competency of counsel, rather than focusing on isolated instances during trial (*People v. Davis* (1981), 103 Ill. App. 3d 792, 431 N.E.2d 1210). In order to establish a violation of his constitutional rights, defendant must show within the above limitations that his appointed counsel was actually incompetent in carrying out his duties as a trial attorney, resulting in substantial prejudice without which the outcome probably would have been different. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.

Turning to defendant's first allegation of incompetence, we note that the decision whether or not to file a motion to suppress is generally characterized as a matter of trial tactics and is therefore outside the scope of our review (*People v. Hines* (1975), 34 Ill. App. 3d 97, 339 N.E.2d 489), particularly where it appears that the decision was based on counsel's informed judgment (*People v. Reppa* (1982), 104 Ill. App. 3d 1123, 433 N.E.2d 1091). Here, counsel attempted to develop the illegality of defendant's arrest in questioning the State's witnesses at the hearing, and argued to the trial court:

> "But I think what we have here, Judge, first of all we've got an illegal arrest. There is no question about that, and I think this court has the authority even at this point to consider that."

Defendant maintains that failure to act on his belief proves that defense counsel was unaware of the decisions in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, which establish that a custodial detention for investigatory purposes is tantamount to an illegal arrest if grounded on less than probable cause, and triggers the same safeguards as an illegal arrest; *i.e.*, exclusion of statements obtained as the fruits thereof. We find this ar-

gument unpersuasive, since counsel could have characterized the detention here as an illegal arrest only if he did have knowledge of the principles established by *Dunaway* and *Brown.* In addition, nothing in the quoted statement shows that counsel was unaware of the exclusionary rule as it relates to illegal arrests.

■■ It is more likely that defense counsel concluded that the court could find probable cause for defendant's arrest, rendering a motion based on illegal arrest frivolous. We do not consider this judgment patently incorrect (*People v. Stanley* (1978), 62 Ill. App. 3d 638, 378 N.E.2d 1351) since, although the arresting officers stated that defendant was taken into custody for "questioning," and was being held "on suspicion," their subjective belief, while relevant to whether probable cause existed (*People v. Thomas* (1980), 80 Ill. App. 3d 1121, 400 N.E.2d 1019), does not control the issue (*People v. Moody* (1981), 97 Ill. App. 3d 758, 423 N.E.2d 566), and the court would consider whether, objectively, the officers had probable cause to arrest the defendant (*People v. Kincy* (1982), 106 Ill. App. 3d 250, 435 N.E.2d 831). The objective facts in this case support a finding of probable cause. At the time defendant was asked to accompany the officers to the police station, they knew that a murder had occurred between 1:30 and 3 a.m.; that a trail of blood led from the murder scene across the street to Castillo's apartment; that defendant had arrived at Castillo's apartment, bloodstained and with a cut on his hand, between 2 and 3 a.m.; that defendant was secretive about his injury; that entirely different explanations for the injury were given to them and to Castillo; and that the explanation offered to them was untrue. Compare *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.

Defendant further argues that counsel was incompetent in neither arguing to the jury nor requesting an instruction on self-defense. He asserts that, in the alternative, counsel should have argued that his actions constituted voluntary manslaughter, based on an unreasonable belief that his use of force was justified.

Generally, the decision to rely on one theory of defense to the exclusion of others is a matter of trial tactics. (*People v. Tennyson* (1979), 75 Ill. App. 3d 341, 394 N.E.2d 418). Here, defense counsel chose to argue that the State failed to prove his client guilty beyond a reasonable doubt. He relied heavily on defendant's testimony that the victim was alive when he left the tavern and the blows struck were not sufficient to kill him, arguing to the jury that, if defendant were guilty, he would have fled; that it was possible that someone else, seeing the victim in a vulnerable position, killed him in the process of stealing the missing cash; and that the police, given the names of sev-

eral other suspects, failed to investigate those leads and failed to take fingerprints at the scene. Clearly, a defense based on self-defense would have been incompatible with this theory, since it would require that defendant admit to the killing.

■ Moreover, it is not incompetent for counsel to refrain from raising issues which he has determined are without merit, unless his appraisal of merit is patently incorrect. (*People v. Stanley* (1978), 62 Ill. App. 3d 638, 378 N.E.2d 1351.) Here, counsel might well have concluded that a defense based on self-defense, even one based on an unreasonable belief that force was necessary, would be unsuccessful. There was evidence of a robbery motive but no evidence that the victim was of a violent nature, from which the jury might well conclude that defendant's story of the victim calling him into the tavern in order to attack him was not worthy of belief, as no motive therefor was evident. In addition, the victim, who was 63 years old, five feet three inches tall, and weighed 130 pounds, was brutally beaten, apparently in several areas of the tavern, as he attempted to escape his attacker; while defendant, who was 25 years old, five feet eight inches tall, and weighed 196 pounds, received only a small cut on his hand. While appellate counsel might have chosen a different defense, given trial counsel's lack of success with the defense chosen, we cannot say that the decision made was patently incorrect; nor can we say, given the above evidence, that the failure to argue self-defense showed actual incompetence resulting in substantial prejudice without which the outcome would have been different.

Defendant further argues that defense counsel was incompetent in making the following remarks during his opening statement:

"All that we are required to do, or that we will do is try to raise the question of reasonable doubt in the mind of you people.

We will be asking questions, we will be constantly sparring with the State's Attorney, we will be attacking their witness, this is to raise certain questions, which we feel are relevant to the case.

\* \* \*

We, and the defendant, feel we can raise a question or reasonable doubt. We will pose questions, and questions arise in your mind. You have to add up all these questions, weigh all the evidence, and if you find that there is reasonable doubt, that Mr. Gallardo did commit the offense of murder, he is entitled to a not guilty verdict."

He maintains that this passage placed in the jury's minds the errone-

ous belief that defendant had the burden to raise a reasonable doubt in this case.

■ Initially, we note that immediately prior to the above quotation, defense counsel stated:

"Now, the State has brought the charge of murder against the defendant. They must prove to you all of the elements of the case. They must prove all these elements beyond a reasonable doubt."

When read in context, it appears that counsel intended to convey that defendant need not present any evidence but could rely on the reasonable doubts left by the State's case, doubts that he would be pointing out through cross-examination of the State's witnesses. The quote, when read in its entirety, cannot be said to have implanted an erroneous impression of the law in the jury's minds.

Even assuming *arguendo* that the above passage did imply that defendant bore some burden in this matter, that implication was corrected by trial counsel's additional comment in his opening statement that the State had the burden of proof; by his reminder of the proper burden during closing argument; and by the court's instruction that the State had the burden of proving defendant guilty beyond a reasonable doubt and that he need not prove his innocence. Additionally, given the overwhelming evidence of defendant's guilt, we do not believe that these remarks caused substantial prejudice without which the outcome probably would have been different.

Moreover, when the circumstances of the trial are viewed in totality, it appears to us that defendant was competently represented. Counsel filed a timely, albeit futile, motion to suppress, thoroughly cross-examined the State's witnesses and skillfully directed his own witness, made timely and appropriate objections, presented an organized closing argument, and timely filed a motion for a new trial.

Defendant next contends that he was denied a fair trial when (a) the jury was given a confusing instruction on the definition of voluntary manslaughter, and (b) the trial court, outside the presence of defendant or his counsel, failed to answer the jury's question concerning language in the instruction. He argues that the jury's question proves that it was confused on this issue, and therefore it could not have performed its function properly. The State maintains that defendant is estopped from claiming error in giving an instruction which he tendered.

■ We first consider the question of estoppel, and find *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319, dispositive. There, defendant contended that the trial court erred in denying his

motion for a mistrial, arguing that the jury's questions proved that they were confused by the instructions. We held that the defendant was estopped from arguing that an instruction tendered by him was inadequate and confused the jury.

Defendant maintains that the instant case is distinguishable because he has raised serious questions as to defense counsel's competence. We have already addressed that issue and have found that defendant received effective representation. Furthermore, we fail to see how defendant was prejudiced by the tendered instruction and any resulting confusion. The instruction in question states:

> "A person commits the crime of voluntary manslaughter who kills an individual who if at the time of killing he acts under sudden and intense passion resulting from serious provocation from the deceased's conduct to excite an intense passion in a reasonable person."

This appears to be an attempt to paraphrase Illinois Pattern Jury Instruction, Criminal, No. 7.03 (1968), which provides in relevant part:

> "A person commits the crime of voluntary manslaughter who kills an individual if, at the time of the killing, he acts under a sudden and intense passion resulting from serious provocation by [the deceased] ***. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

Defendant asserts that the instruction, as given, is confusing—a conclusion he maintains is apparent from the jury's question whether "resulting from serious provocation by the deceased" means serious in the eyes of the defendant. However, if such confusion was indeed caused by the instruction in question, it was actually favorable to defendant, since the proper standard is whether there is objective evidence of serious provocation rather than defendant's subjective mental state (see *People v. Simpson* (1978), 57 Ill. App. 3d 442, 373 N.E.2d 809; Ill. Rev. Stat. 1979, ch. 38, par. 9—2), thus negating any possibility of prejudice.

Defendant further suggests that Supreme Court Rule 451(c) (73 Ill. 2d R. 451(c)), which provides in relevant part that "substantial defects [in criminal instructions] are not waived by failure to make timely objections thereto if the interests of justice require," is applicable to the facts of this case.

Rule 451(c) is a limited exception (*People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513) applicable to waiver by failure to object (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331). Defendant has not cited, nor has our own research discovered, any case in which this rule has been applied to estoppel. In addition, the cases relied upon by

defendant are factually distinguishable and involve more "substantial defects" than the awkward phraseology involved here. *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532 (conflicting instructions, one of which was an erroneous statement of the law); *People v. Nugin* (1981), 99 Ill. App. 3d 693, 425 N.E.2d 1163 (instruction misstated the law; *People v. Mitchell* (1975), 27 Ill. App. 3d 117, 327 N.E.2d 158 (court refused to give an instruction supported by the evidence).

We next consider defendant's contention that the trial court answered the jury's question on the issue of voluntary manslaughter outside his and his counsel's presence. While defendant has a constitutional right to be present, either in his own right or by counsel, at proceedings involving his substantial rights (*People v. Mallett* (1964), 30 Ill. 2d 136, 195 N.E.2d 687), which includes communications with the jury during its deliberations (*Parker v. Gladden* (1966), 385 U.S. 363, 17 L. Ed. 2d 420, 87 S. Ct. 468), violation of this right is not *per se* prejudicial (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697); rather, we must determine whether there is such a probability of prejudice to the defendant that the communication must be "deemed inherently lacking in due process" (*People v. Rhoden* (1981), 101 Ill. App. 3d 223, 427 N.E.2d 1292).

Here, the trial court received the following communication from the jury:

> "May or could the words in the Judge's charge 'resulting from serious provocation by the deceased' mean or include serious in the eyes of the defendant?"

The court asked if counsel would enter into an "agreed order" that he answer "no." After a short conversation, Assistant State's Attorney Kearney, who represented the State at the trial, and Ms. Placek, whose status does not appear on the record, agreed that the following response should be returned:

> "You have received all the instructions and explanations you will receive in the trial of this matter."

Defendant relies on the fact that Ms. Placek was not his attorney-of-record and had made no previous appearance in this case in arguing that he was not represented by counsel. It is reasonable to assume that Ms. Placek spoke on behalf of the public defender's office, which was charged with defendant's defense, since it is doubtful that the trial court would have sought an "agreed order" from someone unconnected with the case.

We need not resolve this factual question, however, since even if we assume that the court communicated with the jury while defendant and his counsel were absent, we see no probability of prejudice.

The court could have responded to the jury's question by answering in the negative, for the question whether sufficient provocation existed is to be judged by an objective standard. The other alternative, and the one employed in this case, was to refuse further instruction. As we noted earlier, defendant was not prejudiced by this response, since it allowed the jury to apply a more lenient, subjective standard in determining the issue of voluntary manslaughter.

■■ An analogous situation arose in *People v. Rhoden* (1981), 101 Ill. App. 3d 223, 427 N.E.2d 1292. There, the jury asked for a magnifying glass during its deliberations, and the trial court, outside the presence of defendant or his counsel, responded "none available." This court found that his response was the only appropriate reply under the circumstances and the communication was therefore "nonprejudicial to the defendant's sixth amendment right to be present during all proceedings." (101 Ill. App. 3d 223, 227, 427 N.E.2d 1292, 1295.) Here, although there were two proper alternatives, the one which was actually less harmful to defendant's case was given, and we therefore find no prejudice to his right to be present.

Finally, defendant contends that the trial court abused its discretion in sentencing him to an extended term of 60 years. He argues that the sentence is not warranted by the facts of the homicide or by the nature of the defendant, and asks that we exercise our authority pursuant to Supreme Court Rule 615(b)(4) (73 Ill. 2d R. 615(b)(4)) and reduce his sentence.

Sentencing decisions are matters of judicial discretion, and so long as the sentence imposed is within the statutory limits, we may not exercise our power to reduce it absent a finding that the court has abused that discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Givens* (1977), 46 Ill. App. 3d 1035, 361 N.E.2d 671), since the trial court has a better opportunity to acquire information about the defendant (*People v. Garrett* (1978), 57 Ill. App. 3d 906, 373 N.E.2d 792) and assess factors in aggravation and mitigation (*People v. Frazier* (1977), 53 Ill. App. 3d 884, 369 N.E.2d 398). A rebuttable presumption arises that the sentence imposed was proper (*People v. Berry* (1980), 86 Ill. App. 3d 755, 408 N.E.2d 466), and is only overcome by an affirmative showing (*People v. Clune* (1980), 82 Ill. App. 3d 545, 402 N.E.2d 928) that the sentence imposed varies greatly from the purposes and spirit of the law (*People v. Lloyd* (1981), 92 Ill. App. 3d 990, 416 N.E.2d 371) or is manifestly violative of constitutional guidelines (*People v. Scott* (1977), 45 Ill. App. 3d 487, 359 N.E.2d 878), which provide that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the

objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, sec. 11), factors entitled to equal weight in fixing punishment (*People v. Simpson* (1978), 57 Ill. App. 3d 442, 373 N.E.2d 809).

Here, the trial court expressly found that the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" as required by section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)) before imposing a sentence under the extended term provisions of section 5—8—2 (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2), which allows a sentence of not less than 40 nor more than 80 years. This finding is certainly supported by the facts of this case, which show even more brutality than we found in *People v. Davis* (1981), 98 Ill. App. 3d 461, 424 N.E.2d 630, where we upheld imposition of a 70-year extended term for murder. It appears from the evidence that repeated blows were struck as the victim tried to escape from his attacker, who literally beat him to death.

■ Defendant maintains, however, that "the court made no finding that the defendant lacked rehabilitative potential," and asserts that the record shows his potential for restoration to useful citizenship is great. Initially, we note that the trial court need not make an express finding that defendant lacked rehabilitative potential before imposing an extended sentence, since that factor is not entitled to greater weight than the nature of the offense. (*People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818.) Furthermore, the court indicated that it had considered all of the facts and circumstances in reaching its decision, and the mitigating factors defendant relies on in his argument are contained in either the presentencing report or defense counsel's argument at the sentencing hearing. Although defendant has no prior criminal record, the evidence shows that the murder was particularly brutal, and we do not believe that the sentence imposed was greatly at variance with the purpose and spirit of the law. We conclude that the trial court did not abuse its discretion in imposing this extended term of 60 years.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.