THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARRY HOLLOWAY *et al.*, Defendants-Appellants.

First District (4th Division)   Nos. 81—2055, 81—2195 cons.

Opinion filed January 24, 1985.—Rehearing denied April 10, 1985.

Steven Clark and Richard J. Faust, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jeanette Sublett, and Timothy J. Frenzer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendants, Harry Holloway (Holloway) and Judy Jackson (Judy), were found guilty, in a jury trial, of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)), and each was sentenced to 40 years' imprisonment. The victim, Alexander Jackson (Alexander), was Judy's husband. Defendants raise the following issues for review: (1) whether the police possessed probable cause to arrest Holloway at 3 a.m. on July 12, 1979, and whether an inculpatory statement and a gun obtained as a result of that arrest should have been suppressed by the trial court; (2) whether exigent circumstances existed for the police to make a warrantless arrest of Holloway in his home; (3) whether Holloway freely and voluntarily made an inculpatory statement to the police; (4) whether Judy freely and voluntarily made an inculpatory statement to the police; (5) whether Holloway and Judy were proved guilty beyond a reasonable doubt of murder; (6) whether Holloway committed murder or voluntary manslaughter; (7) whether Judy was proved guilty beyond a reasonable doubt of any criminal conduct in regard to the

death of Alexander; (8) whether the trial court erred when it refused to allow Holloway's tendered jury instructions on self-defense and voluntary manslaughter; (9) whether the trial court erred when, without any indication that the jury was deadlocked, it gave the *Prim* instruction; (10) whether the trial court erred in refusing to give Judy's tendered instruction concerning "mere presence"; (11) whether the trial court abused its discretion in sentencing Holloway to 40 years; and (12) whether the trial court abused its discretion in sentencing Judy to 40 years.

We affirm.

On July 11, 1979, June Hampton was employed as a desk clerk at the Ranch Motel, located at 9201 South Stony Island Avenue, in Chicago. Hampton testified that around 11 p.m., a Yellow Cab approached the motel. The passenger, a man (Alexander), registered as Mr. and Mrs. Jackson of 8014 South Champlain, Chicago, and rented room No. 41. He did not seem intoxicated. The man returned to the cab. Hampton and Verzel Squair, a friend who had been sitting in the lobby, noticed another man who was in the driver's seat of the cab and a red-headed woman seated in back. The cab drove toward room No. 41. Ten minutes later, Hampton saw the cab pass the office. Around that time she and Squair heard a man screaming for help. She asked Squair to investigate. Squair saw Alexander, bloody and nude, in the doorway of the room. Squair went back to the lobby to advise Hampton to call the police, which she did. Then Hampton and Squair saw the cab again as it traveled north with the man and the woman who had been observed earlier; the man was driving and the woman was now sitting in the front seat. Squair noticed the cab number on the license plate and the side of the vehicle and informed Hampton. She wrote the number on the back of the registration slip she had prepared for Alexander.

Officers Willie Clay and Jerry Chapman were the first policemen to arrive. Later they were joined by police officers Daniel Swick and JoAnn Ryan. Alexander had three head injuries and two gunshot wounds. Blood was spattered throughout the room, on the walls, in the doorway and on the bed. An open liquor bottle was on the nightstand, a claw hammer was inside the closet, a pair of women's eyeglasses was on the dressing table, and a man's clothing was in the bathroom. The victim's identification was in a wallet in his trousers.

Officer Swick was given the registration card for the room. He telephoned Judy around 2 a.m. on July 12, 1979, informing her that her husband was dead. Swick also telephoned the Yellow Cab Company, which informed him that cab No. 1558 was leased to Harry Hol-

loway, who lived at an address on East 99th Street in Chicago.

Officer Swick arrived at Holloway's residence at about 3 a.m. with Officer Ryan and Officer John Yucaitis. Although police had time to obtain a warrant, none was issued. Swick knocked on the door, identified himself, and asked Holloway whether cab number 1558 belonged to him. Holloway answered in the affirmative. Swick informed Holloway that his cab might have been used in the commission of a crime. No *Miranda* warnings were given. Holloway allowed the police to enter his home, and later he agreed to come to police headquarters. He was not handcuffed.

When Officer Swick observed the cab parked in front of Holloway's residence, he noticed a blood smear on the door handle on the driver's door. Swick asked Holloway's permission to drive the cab to the police station. Holloway consented and gave Swick the keys.

At the police station, around 3:15 a.m., Officer Swick advised Holloway of his *Miranda* rights prior to speaking with him. He and Holloway talked for 30 to 45 minutes. Holloway was not handcuffed. Swick did not strike or threaten Holloway nor did he see anyone strike or threaten him. Holloway never indicated that he did not wish to answer questions. He never said he desired to have a lawyer present, and he did not ask to make a telephone call. Swick did not notice any bruises on Holloway. The latter did not complain of mistreatment, and he never asked to be allowed to take medicine or said he had diabetes. Holloway did not have anything to eat or drink and took no medication. No one lied to Holloway about evidence inculpating him.

Officer Swick asked Holloway his whereabouts on the previous evening. Holloway stated that he started driving about 7 p.m. and described his "fares." He drove his last fare to a motel at 94th and Stony Island, then drove around for about 20 minutes and then went home. When asked, Holloway denied that he had been to the Ranch Motel. Swick showed Holloway the front of the registration card with the Jacksons' name and address. Holloway stated that Alexander was his friend but denied taking him to the motel. Then Swick showed him the back of the card on which his cab number was noted. Holloway admitted that he picked up Alexander at 80th and Cottage Grove and drove him to a motel at 94th and Stony Island. Alexander went into the motel but returned to the cab, stating that no air-conditioned rooms were available. Alexander asked Holloway to drive him to the Ranch Motel. Holloway dropped him off in front of the motel and drove away. Holloway denied that he drove into the motel grounds and stated that only two people were in the cab. Swick told Holloway

that he had been seen at the motel; Holloway denied that he was there. During this interview, Swick noticed what appeared to be bloodstains on Holloway's shirt. The latter explained that he had been eating barbecue but agreed to remove his clothes so that the nature of the stains could be determined. Swick confiscated Holloway's shirt, T-shirt, pants, shoes and a ring. Swick found currency which appeared to be bloodstained in Holloway's pockets.

Holloway agreed to let Swick search the cab and gave him the keys. Swick recovered from the cab a bag with 22 bullets in it and a pouch containing insurance papers. Swick did not ask Holloway's permission to open either the bag or the pouch and no consent form was signed for the search of the cab. On July 12, 1979, Swick never saw Holloway handcuffed.

Around 6 a.m. on July 12, 1979, Judy was brought to the police station by an officer. Swick interviewed her in the presence of Officer Ryan. Swick offered Judy a drink but she refused. She was not handcuffed and did not say she felt ill. Swick again informed Judy of her husband's death and asked her his whereabouts on the previous evening. Judy said her husband was with her until 7 or 7:30 p.m., when he left to visit his sister on the West Side. Swick asked Judy whether she knew Harry Holloway. She said she had known him for five years. Earlier, on that evening, he had been at her home for dinner and drinks with her and her husband. Swick showed Judy the eyeglasses that had been recovered from the motel. She acknowledged them as her own. He asked her how they came to be in the motel room. Judy said that while she and her husband were jogging the glasses fell off her face; her husband had picked them up and put them in his pocket.

Dennis McGuire, a Chicago police officer, was assigned to the homicide when he reported for work at 8 a.m. on July 12, 1979. He was working with his partner, John Yucaitis. He discussed the case with Officer Swick and he was informed of the results of preliminary interviews. No arrest or search warrants were issued in connection with the case. McGuire had conversations with Holloway around 9:45 a.m., 11:30 a.m., and in the afternoon. At the first interview, Holloway was advised of his *Miranda* rights. McGuire presented a consent-to-search form to Holloway and explained it. Holloway signed the form. McGuire never saw anyone strike or threaten Holloway, and he had no bruises. Holloway did not say he had diabetes and needed medication or that he wanted to see a physician. He never said he wanted a lawyer. Holloway was not sweating, trembling or exhibiting abnormal physical conditions. McGuire never saw Holloway eat or sleep.

McGuire interviewed Judy three times—at about 9:50 a.m., 11:30 a.m., and 12:25 p.m. McGuire introduced himself before their first interview and advised Judy of her *Miranda* rights, which she said she understood. During their conversations, Judy was not handcuffed. She neither requested an attorney nor asked to use the telephone. She did not say that she felt hungry, thirsty or ill and did not appear to be ill. McGuire was certain that Judy had water but did not recall giving her food. Judy did not say that police officers promised to take her home and she did not say she had been "tricked." No one made misrepresentations to her.

McGuire showed Judy a consent-to-search form and explained it to her. He filled in the empty spaces. After reading the form, Judy signed it at around 10 a.m. McGuire and Yucaitis searched Judy's home at about 10:15 a.m. When they entered the apartment, they observed a crinkled piece of paper on the living room floor. It was a key receipt, dated July 11, 1979, for room No. 41 of the Ranch Motel.

The police officers returned to the station to interview Judy. McGuire asked her whether she had ever been at the Ranch Motel. She said no. McGuire told her about the receipt and she responded, "Then you know about it." Judy said she had a fight with her husband which bloodied her clothing. She put the clothes in a suitcase near her bedroom. She said she was never at the motel; Holloway apparently placed the receipt in her apartment since he had a key.

Later, Judy said she was at the motel with her husband and that Holloway drove them there. Her husband became abusive. When she screamed, Holloway came to the motel room. As she ran out the door, she heard two shots. Holloway drove her home.

Officers McGuire and Yucaitis interviewed Holloway, who was advised of his *Miranda* rights and who said he understood them. McGuire then told Holloway the story Judy had told them. Holloway said that when he entered the motel room, Alexander attacked him with a hammer. They struggled and Holloway managed to take away the hammer. Then, Alexander produced a gun. After a struggle, it discharged twice. Holloway left and drove Judy home. At noon, McGuire and Yucaitis placed Holloway under arrest and handcuffed him.

At about 12:20 p.m., Officers McGuire and Yucaitis interviewed Judy and presented her with a consent-to-search form, which all three signed. McGuire filled in the form. The officers returned to the Jackson residence to recover the bloody clothing. Inside the suitcase was a bloodstained dress and undergarments and a hand towel. McGuire and Yucaitis proceeded to the Ranch Motel to look for a weapon because

Holloway had said he discarded the gun on the motel grounds. The police officers failed to find the gun, and McGuire so informed Chicago police investigator Joseph Griffin.

Investigator Griffin and Investigator Frank Laverty were assigned to the homicide case on July 12, 1979. After speaking to Officers Yucaitis and McGuire, Griffin had a conversation with Holloway at about 2 p.m. During this and later conversations, no one struck or threatened Holloway. There were no bruises on him; he did not appear to be tired; he did not complain of mistreatment; he did not state that he did not wish to answer questions; and he did not say that he wanted to consult a lawyer. Holloway never requested medical treatment or said he had diabetes. He was handcuffed while Griffin was at police headquarters.

After *Miranda* warnings, Investigator Griffin informed Holloway that no gun was found at the motel. About 10 minutes after police began interviewing him, Holloway volunteered to take police to his home. He signed a consent-to-search form. Holloway told police that he would show them where he had hidden the gun at his residence. The gun was hidden in the rafters of his kitchen. It was a .22-caliber weapon with three spent and three live rounds.

Another interview occurred at 3 p.m. Holloway stated that he picked up the Jacksons. Alexander wanted to go to a motel and Holloway drove them to the Dunes Motel. The couple argued over whether or not they should get a motel room. Alexander went into the Dunes Motel and returned shortly thereafter, stating that the motel had no air-conditioned rooms available. Holloway drove a few blocks north to the Ranch Motel. Alexander entered the office to rent a room. Holloway then drove the Jacksons to room 41. Their argument continued. Holloway remained outside listening to the argument. The motel door opened suddenly and Alexander grabbed Judy to prevent her from leaving. Because Holloway and Judy had been friends for a long time, Holloway tried to defend her. When he entered the motel room, Alexander attacked him with a hammer. Holloway disarmed Alexander but the latter drew a revolver. During the ensuing struggle, Alexander had his finger on the trigger of the gun, which discharged three times. Alexander fell and Holloway fled. He drove Judy home. Thereafter, he drove around for a while and then drove home.

At 3:30 p.m., Investigator Griffin interviewed Judy; she may have been handcuffed. Shortly thereafter, he was informed that assistant State's Attorney Paul Szigetvari was in the police station. Szigetvari was assigned to felony review. Griffin, Lavert, McGuire and Yucaitis spoke briefly with Szigetvari. Szigetvari then joined Griffin in inter-

viewing Judy.

Szigetvari introduced himself as an assistant State's Attorney; he never said he was a public defender. He advised Judy of her *Miranda* rights before conversing with her. Judy appeared normal; she never indicated that she was hungry, thirsty, ill, needed medication or wanted a physician. She never said she was denied use of the telephone.

Judy stated that she and Holloway were lovers. Three days before Alexander's murder, they decided to kill Alexander by throwing a radio into the tub while he was showering. But when the time came for Judy to do the act, Alexander asked her why she was wearing a glove. She did not proceed with the electrical shock attempt. Another plan was for Judy to scream while she and her husband were engaged in sex, at which point Holloway would come in and hit Alexander with a hammer.

On July 12, 1979, Szigetvari spoke with Judy and then with Holloway on four occasions. Investigator Griffin was also present. Szigetvari advised Holloway of his *Miranda* rights. After the last of these interviews, Szigetvari asked Holloway whether he was willing to make a written statement, and he answered affirmatively. Szigetvari also took a written statement from Judy. Szigetvari noticed nothing unusual about Holloway's physical condition. Holloway never complained that he required medical attention; he never said he wished to see a doctor or wanted medication; and he never said he asked police for medicine and they refused him. Holloway was not perspiring; he was calm and his speech was articulate. He was not handcuffed; neither was Judy handcuffed, and she made no requests or complaints. She did not appear to be tired.

Janet Lupa, a court reporter, recorded the statements of Holloway and Judy on the evening of July 12, 1979. In her presence, Holloway did not complain of a diabetic condition; he did not mention medical or physical problems. He was not perspiring, shaking or holding his head, and his answers to questions were responsive. Neither he nor Judy was handcuffed, and Judy made no complaints.

James Linn, an assistant State's Attorney assigned to felony review, relieved Szigetvari on July 12, 1979. Linn received from court reporter Lupa the typewritten statements of both defendants. Linn read the statement with Holloway and asked him to sign it. Then Lupa photographed Holloway. The same procedure was followed with Judy.

Holloway's statement was taken at 7:45 p.m. on July 12, 1979, in the presence of Szigetvari, Griffin and Lupa. Holloway and Judy had

known each other for three years and were lovers. In March 1979, Judy first began to suggest to Holloway that he kill Alexander. Three days before the murder, Judy and Holloway discussed killing Alexander by dropping a radio in the bathtub while the latter was bathing. Defendants bought extension cords to carry out their plan. The incident was to occur on the evening of July 11, 1979. While Alexander was in the tub, he asked Judy why she wore rubber gloves. Judy decided not to proceed. In a telephone conversation, Judy told Holloway that she had another plan. She asked Holloway to pick her up and also her husband and drive them to a motel, which he did. Judy planned that she would get Alexander to take a shower and that Holloway would enter the room after she screamed, under the pretense that she was being assaulted.

After transporting the Jacksons to their motel room, Holloway parked the cab on the street and walked back to the motel. He had a claw hammer. When he heard screaming, he entered the room. Judy and Alexander were engaged in an act of cunnilingus. Twice Holloway hit Alexander on the head with the hammer. Alexander turned and grabbed Holloway's legs. Alexander had a gun in his hand. A struggle over the gun ensued. Holloway squeezed Alexander's hand and the gun fired. Later, the gun fired another time. Defendants fled. Holloway took the gun with him although it did not belong to him. Defendants went to Judy's apartment, where they engaged in sexual intercourse.

Judy's statement was taken at 8:20 p.m., on July 12, 1979, in the presence of Szigetvari, Griffin and Lupa. Judy and Holloway had been lovers for about a year. Judy disliked her husband. Three days prior to the murder, Judy and Holloway discussed a plan to electrocute her husband but it was not carried out. They decided to have Alexander killed by battery. Holloway drove Judy and her husband to the motel room. After the Jacksons showered, they "tussled." Alexander had a hammer in his hand. Then Judy and Alexander engaged in oral sex. Holloway entered the room and twice hit Alexander with the hammer. Holloway drew a gun from his pocket and told Alexander he would kill him. Judy believed the gun belonged to Holloway. Alexander said, "Don't do this to me." After Judy and Holloway fled the motel, the latter said that Alexander "just won't die." When they arrived at Judy's apartment, they made love. In Holloway's cab there was a yellow case containing Alexander's $10,000 insurance policy.

Lawrence Pajowski, a Chicago policeman, transported Holloway from one police station to another. Holloway did not complain of illness or mention that he had a diabetic condition.

Fawzi Suliamen, a physician on duty at the hospital for Cook County jail, saw Holloway on July 15, 1979. Holloway complained of dizziness and told him he was a diabetic. He said he had not taken his medicine for 30 days. He was not in an emergency situation.

At Holloway's suppression hearing, police officers and other witnesses testified. Holloway stated that he was a cab driver and that he suffered from hypertension and diabetes. When he was taken to the police station in the early morning hours of July 12, 1979, he had not slept since the night of July 10. On July 11, he awoke about 5 a.m. The last time he had food or liquids was at 2 p.m. on July 11, and the last time he had medications was at 7 a.m. on July 11. He did not sleep or eat or take any medication on July 12. He drank water when he was taken to the men's room at the police station, but he drank nothing when he was taken to his place of residence on July 12. When Holloway was taken to a second lockup, he slept and was given food and drink. He received no medication until July 15, when he was taken to the hospital. He told medical personnel there that he had received no medication for three days.

When the police first visited Holloway at his home, they asked whether they could look at his cab. He cooperated because he felt intimidated. This is why he agreed to go to the police station. He was advised of his constitutional rights when he arrived at the station. He was handcuffed there, but he could not remember exactly when that occurred. Holloway gave Officer Swick the keys to the cab because he (Holloway) felt he could not refuse.

About an hour after his arrival at the station, Holloway changed his clothes. He felt sleepy and dizzy. His condition worsened as the day progressed. He talked to many policemen on July 12, but he could not recall what he or they said. Holloway did not read well without his reading glasses. Despite this fact, he signed consent-to-search forms for his house and vehicle, and he signed a statement at times when he was not wearing those glasses.

When Holloway was at the police station, he asked for a drink but none was brought. He was allowed to go to the washroom, where he drank water. He told the police he was a diabetic and asked that someone get his medicine from his home. He did not ask for a doctor. During the day of July 12, Holloway was perspiring heavily; he was weak and his body was shaking. Holloway remembered telling police that the gun was hidden in his home and he remembered showing them where it was hidden.

During cross-examination, Holloway frequently could not recall or was vague with respect to what happened while he was at the police

station.

After Holloway's testimony, counsel stipulated that when police arrived at Holloway's residence they were looking for an unidentified male wearing a white shirt and an unidentified female with sandy red hair.

Alexander Cardoso, a physician, reviewed Holloway's files from a medical clinic. Holloway was treated and received medication for diabetes and hypertension. In Cardoso's opinion, if Holloway had no food, water, sleep or medication from the evening of July 11 or the early hours of July 12 until the late hours of July 12, the effects would be headaches, dizzy spells, disorientation and confusion, and a lack of understanding of what was asked of him.

The trial court ruled that Holloway was seized by police at 3 a.m. on July 12, 1979, and that there was probable cause to arrest him because cab No. 1558 had delivered the victim and a female to the motel and was seen leaving the motel after screams were heard. Police had a right to search the cab, but they had no right to search containers found within the cab. The trial court found that Holloway knowingly and intelligently responded to questions asked of him and that he voluntarily answered those questions. The court denied the motion to suppress statements and to quash arrest, but it suppressed the bullets and insurance papers found in the containers which were inside the cab.

At Judy's suppression hearing, police officers and other witnesses testified. Judy stated that on July 12, 1979, at 1:30 a.m., her landlord told her that her husband had been killed. At 6 a.m., a police officer took her to the police station. When she asked him the reason, he told her that it was for security reasons. He also told her that she would be able to retrieve her husband's personal effects. She was not told that she was under arrest. At the station, she was handcuffed to a wall. Thereafter, other police officers questioned her and showed her certain objects, none of which was a note or a receipt. An officer told her that her husband was dead. He said that there seemed to have been a fight and asked whether she knew anything about it. Judy did not respond. Judy recalled, generally, that the police told her what Holloway had said, but she did not remember specific statements. The police did not hit her.

Judy was questioned for hours—from 6 a.m. on July 12 to 2 a.m. on July 13—by seven to 10 police officers. She was allowed one telephone call. She ate no food and drank only a cup of coffee. She was on medication, which made her sleepy, and took four or five doses while at the police station. Judy remembered that between 11 a.m.

and noon she signed a consent form to search her residence, but she did not read it prior to signing. She signed the form when she was sleepy and tired and feeling the effects of the medication. She was also hungry. She did not recall signing a second consent-to-search form at 12:30 p.m. In fact, Judy signed the first consent form at 10 a.m.

Judy talked to a man whom she thought to be a public defender, because a policeman had told her the man was from the "P.D." Later the man introduced himself as an assistant State's Attorney. She had a conversation with the attorney in the presence of a court reporter. She was not handcuffed during that conversation and she was not advised of her constitutional rights until the court reporter was present. Judy did not remember certain questions that had been asked of her nor the answers she gave in her written statement. Judy was informed at 2 a.m. on July 13 that she was being charged with murder.

The trial court ruled that Judy made a knowing, voluntary and intelligent waiver of her rights, and it denied her motion to suppress.

At the joint trial of defendants, Alexis Batts, the niece of Alexander, testified that Judy and Alexander were married on December 2, 1978. She identified his body on July 14, 1979. Dorothy Moore, Alexander's sister, testified that he constantly used a cane and took daily medication of Valium, codeine, digitalis and insulin.

Robert Stein, chief medical examiner for Cook County, performed an autopsy upon Alexander. He observed two lacerations on the head, a bullet wound on the left side of the neck, and another bullet wound in which the bullet entered the lower part of the left chest and traveled downward. The cause of death was a combination of occlusive coronary atherosclerosis, blunt trauma of the head, and a bullet wound of the neck and abdomen.

Michael Schaffer, chief toxicologist for the county medical examiner, testified that Alexander's blood contained 96 milligrams of ethanol, Valium and codeine.

Richard Chernow, a Chicago police officer and ballistics expert, testified that bullets found in the body of the deceased were fired from the gun found in Holloway's home.

Police officers, assistant State's Attorneys, a court reporter, and other witnesses described events before and after defendants were taken into custody.

Harry Holloway, 66 years old, testified that he had attended elementary school only to the third grade. He took medication for his diabetes and hypertension. When he does not take his medicine, he becomes dizzy and light-headed. When he was at the police station,

police officers told him many times that if he cooperated his handcuffs would be removed, he would get his medicine, and he could go home.

Holloway met Judy in 1977. He considered her to be a goddaughter. He and Judy were never lovers. Holloway met Alexander shortly before the latter married Judy in late 1978. Alexander was a heavy drinker and smoked marijuana.

On July 4, 1979, Holloway observed an argument between the Jacksons in which Alexander threatened Judy with a hammer. On July 11, 1979, Holloway had dinner with the Jacksons. Holloway left their home and returned around 9:30 p.m. Alexander was drinking heavily and smoking marijuana. Alexander, but not Judy, wanted to go to a motel. They argued. Holloway drove the Jacksons first to the Dunes Motel, which had no air-conditioned rooms available, and then to the Ranch Motel. Alexander registered and Holloway drove to room No. 41. Holloway drove off to buy liquor for Alexander but was unsuccessful. He was gone for 15 to 18 minutes. When he returned to the motel he heard screaming. He heard Judy say, "Oh, please, Mr. Jackson, don't." He ran into the dark motel room. He carried a hammer in his hand to knock on the door so that Alexander would hear him. Holloway hit Alexander in the shoulder, saying, "You don't want to do that." Alexander grabbed Holloway's knees. Holloway hit Alexander with the hammer—he did not know how many times. Holloway then felt a gun. The struggle continued, with Alexander trying to shoot Holloway. The gun fired twice. The gun did not belong to Holloway. Holloway never planned to kill Alexander.

Judy seemed injured. He helped her to the cab and drove her home. He returned to the motel, but when he saw policemen there he drove off and sat in his cab for a while. Then he drove home. When the police arrived, they asked whether the cab was his and he replied in the affirmative. One of the police officers said, "Let's get it." Holloway backed the cab out of the driveway and the police searched it. Thereafter, the police announced that he would have to go to the police station. A police officer told him that blood was on his clothes and said, "Let's have those clothes." Holloway was handcuffed from 3:30 a.m. on July 12 to 12:30 a.m. on July 13. The interview room was hot and stuffy. Police officers entered the room, two at a time. Holloway was threatened. He heard someone screaming. He saw a prisoner who was bloodied and whose eyes were swollen. Holloway told police he needed his medication. He was never given food, drink, or allowed to sleep. The police threatened him in order to get him to sign the consent-to-search form.

When the assistant State's Attorney appeared to take his state-

ment, Holloway was dizzy, hungry and thirsty. He was frequently told that if he cooperated he would be released. Holloway could not read without his eyeglasses. The police seized his glasses. His signature on the statement was not his normal signature. He could not see to read the statement or the consent form. He did not recall giving the answers that appeared in the written statement.

Judy Jackson, 30 years old, testified that she had known Holloway since 1977. She considered him her godfather. They never had sexual intercourse. Judy met Alexander early in 1978 and married him on December 2, 1978. Holloway met Alexander through Judy.

In mid-1979, Alexander began to drink heavily and became abusive toward Judy. On July 11, 1979, Holloway had dinner with the Jacksons. Alexander drank heavily that day. Judy first learned that they were going to a motel after she was in the cab. She thought they were just going for a ride. An argument ensued because Judy did not want to spend money for a motel room.

Judy entered the motel room with Alexander following her. The argument became physical. Alexander pulled off her dress. The couple "tussled" from the bathroom to the bedroom. When Judy opened the outside door, Alexander pulled her back. Holloway was outside. While the men struggled, Judy heard a noise that sounded like a firecracker. When Judy and Holloway fled from the room, her nose was bleeding and her side and legs hurt. Holloway drove her home. She claimed that the statement made on July 12, 1979, in the presence of a court reporter was untrue. She was scared and confused when she made those statements. She did not recall signing the consent-to-search form.

The jury found defendants guilty of murder, and the trial court sentenced each defendant to 40 years' imprisonment. Defendants appeal.

Defendant Holloway argues that there was no probable cause to arrest him at the time he was seized (3 a.m. on July 12, 1979); therefore, the inculpatory statement and the gun given by him to the police should have been suppressed as fruits of an illegal arrest. Holloway makes a lengthy argument, the gist of which is that at the time he was seized the police had only a slight suspicion that he was involved in the crime; therefore, the arrest was tainted *ab initio*, so that no later actions by the police, such as *Miranda* warnings, could erase the taint.

It is well established that a warrantless arrest is invalid unless there is probable cause to believe that the person is committing or has committed an offense. (*People v. Jones* (1983), 114 Ill. App. 3d 576,

581, 449 N.E.2d 547, 552.) The test is whether, when viewed objectively, the situation confronting the arresting officer (*People v. Thomas* (1980), 80 Ill. App. 3d 1121, 1125, 400 N.E.2d 1019, 1021), as well as facts known to him, are such as would cause a person of reasonable caution to believe that the individual to be arrested had committed a crime (*People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, 608), bearing in mind that we are dealing with probabilities (*People v. Spencer* (1982), 107 Ill. App. 3d 835, 838, 438 N.E.2d 603, 606), not proof beyond a reasonable doubt (*People v. Blitz* (1977), 68 Ill. 2d 287, 292, 369 N.E.2d 1238, 1240), and whether the police officers' conduct is reasonable must be judged on the basis of the responsibility to prevent crime and apprehend criminals (*People v. Jones* (1983), 114 Ill. App. 3d 576, 581, 449 N.E.2d 547, 552).

A valid arrest occurs when the police informs the defendant of a violation, the defendant submits to the control of the police, it is clear that the police intended to arrest the defendant, and the defendant understood that he was being arrested. *People v. Wipfler* (1977), 68 Ill. 2d 158, 165, 368 N.E.2d 870, 872.

In the instant case, the police officers arrived at Holloway's home after learning that the cab seen at the crime scene was leased to Holloway. Holloway testified that when the police arrived at his home he was not told that he was suspected of a crime. The police officers did not force their way into his home—he invited them in. No guns were displayed by the police officers. Holloway was not handcuffed or in any way physically restrained. The officers asked him to accompany them, and he agreed to do so, although he testified that he did not feel free to refuse. Chicago police detective Swick testified that when he arrived at Holloway's home, he (Swick) had only the limited information that the cab was leased to Holloway and that a man and a woman had been seen leaving the scene of the crime in the cab. The police did not give Holloway *Miranda* warnings, tell him he was under arrest, place him in handcuffs, or force him to accompany them. After telling him that his cab may have been used in the commission of a crime, they asked him to accompany them to the station to answer questions. Holloway was cooperative and agreed to accompany the officers.

■■ ■ The absence of a threatening presence of several police officers, display of weapons, physical touching, use of language or tone of voice which indicates that compliance with the officers' request might be compelled, permits the conclusion that no seizure of the person has occurred. (*People v. Sanders* (1981), 103 Ill. App. 3d 700, 709, 431 N.E.2d 1145, 1153, citing *United States v. Mendenhall* (1980), 446

U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.) Shortly after arriving at the station, Holloway gave several conflicting and inconsistent statements to the police. He even denied that his cab was at the motel (the scene of the crime). When confronted with the motel registration ticket, on which the motel clerk had written the number of his cab, Holloway recanted. Additionally, Officer Swick, an experienced police officer, noticed what appeared to be blood on Holloway's clothing as well as on the door of the cab. We believe the sequence of events that occurred after Holloway's arrival at the police station were sufficient to establish probable cause.

Holloway's own testimony makes it clear that no seizure had occurred when he accompanied the police officers from his home at 3 a.m. on July 12, 1979. Although Holloway states he "thought [he] couldn't refuse," the facts show that he voluntarily accompanied the police officers.

At the suppression hearing, the trial court found that Holloway was seized at his home at 3 a.m. on July 12, 1979, for questioning and that, based on the information garnered from witnesses at the crime scene, there was probable cause for such seizure.

Since it is the judgment, and not what else may have been said by the trial court, that is on appeal to the reviewing court, we are not bound to accept the trial court's reasons for its judgment, and the judgment may be sustained upon any ground warranted, regardless of whether it was relied on by the trial court and regardless of whether the reason given by the trial court was correct. *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12.

Accordingly, although we find there was no probable cause to arrest Holloway when the police first arrived at his home at 3 a.m. on July 12, 1979, we do find that probable cause existed later after Holloway had voluntarily gone to the police station. We hold that the trial court did not err in refusing to suppress Holloway's confession and the gun, since probable cause to arrest existed after his arrival at the station but prior to his confession and surrendering of the gun.

Since we hold that defendant Holloway was not arrested in his home but was arrested later after probable cause had been established, we need not address the issue of whether exigent circumstances existed to justify a warrantless arrest of defendant in his home.

Holloway next complains that his inculpatory statement was not voluntary. He contends that the trial court's finding of voluntariness was against the manifest weight of the evidence. Holloway ar-

gues that the deprivation of medication, food and sleep, combined with his low level of education, overcame his free will.

In determining whether the trial court properly denied Holloway's motion to suppress his statement, the key inquiry is whether the statement was voluntary. The State has a heavy burden to show that a defendant has waived his constitutional rights in a knowing, intelligent, and voluntary manner. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.) The procedural safeguards outlined in *Miranda* recognize that during custodial interrogation coercion can be mental as well as physical. (*People v. Martin* (1984), 102 Ill. 2d 412, 426, 466 N.E.2d 228, 234.) The court looks to the totality of circumstances in determining whether a statement was voluntarily given. (*People v. Martin* (1984), 102 Ill. 2d 412, 426-27, 466 N.E.2d 228.) The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 446 N.E.2d 228, citing *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) Other factors to be considered are the age, education and intelligence of the accused, the duration of questioning, and whether the accused was given his constitutional rights or subjected to physical punishment. *People v. Martin* (1984), 102 Ill. 2d 412, 427, 446 N.E.2d 228.

In the instant case, Holloway was advised of his *Miranda* rights prior to any questioning. He was not handcuffed for several hours after arriving at the police station. The State's witnesses testified in rebuttal that Holloway was not perspiring heavily, did not appear confused, answered questions responsively, and did not complain of illness, ask for medical attention or ask to be allowed to take medication. Holloway testified that during a visit to his home, while in custody, he did not take his medication or mention to the accompanying police officers that he needed to take his medication. Holloway claims that he did not have food or drink for many hours before making the statement. He claims to have heard someone screaming in a nearby room while at the police station, but he makes no claim that he was himself physically abused. Although his education is limited, Holloway is literate. It can be inferred that he understood the questions asked since his answers were responsive.

Although dizziness, confusion and disorientation can result if defendant failed to take his medication, that mere possibility is insufficient proof that defendant's will was overcome and that he was not aware of his actions when he gave the statement. Notwithstanding that it would have been more comfortable for Holloway if he had been

permitted to sleep for several hours, take his medication and eat a good meal prior to his inculpatory statement, we cannot say that the physical discomfort which he may have felt was such as would overcome his free will.

The record shows that Holloway gave more than one version of the events surrounding the killing in an effort to limit the incriminating effects of his final written statement. It is unlikely that one who had lost his free will would be unable to resist confessing, yet, at the same time, attempt to mitigate the effect of a confession. See *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.

All of the State's witnesses who had observed Holloway while in custody denied that he exhibited any of the physical signs of distress which he claims to have had. Although Holloway's medical expert testified as to what the possibilities were if defendant remained without food, sleep or his medication for several hours, his opinion was only *one* of the factors to be considered by the trial court in making a determination.

In viewing, as we must, all of the evidence surrounding the making of the confession (*People v. Kincaid* (1981), 87 Ill. 2d 107, 120, 429 N.E.2d 508, 513), and recognizing that the finding of the trial court as to whether a confession is voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence (*People v. Brownell* (1980), 79 Ill. 2d 508, 521, 404 N.E.2d 181, 188), we conclude that the record clearly supports the trial court's finding of the voluntariness of the confession. We hold that the trial court's denial of Holloway's motion to suppress was not against the manifest weight of the evidence.

■■ Similarly, we reject Judy's contention that it was error for the trial court to have allowed her inculpatory statement into evidence. In accordance with the discussion above, we do not find the circumstances surrounding Judy's statement to have been such that as a matter of law her statement should have been suppressed as involuntary. On the contrary, the record shows no evidence of physical abuse, coercion, or threats. Judy, like Holloway, gave more than one version of the events surrounding the killing before she made a final written statement. She claims to have been dizzy and sleepy because of medication which she took during the hours before her statement. Nevertheless, as with Holloway, although Judy may have been physically uncomfortable, there was no evidence of any apparent manifestations, physical or otherwise, which would indicate that her will had been overcome. We hold that the record clearly supports the trial court's finding that Judy's statement was voluntarily made.

■■ We next address the contention by both defendants that they were not proved guilty beyond a reasonable doubt of murder. Their contention is based on the theory that Alexander was killed as a result of a struggle when Holloway attempted to prevent Alexander from attacking Judy. They argue that since the prosecution's case was based on the fact that Alexander's body was found in the motel and on their inculpatory statements, which were later repudiated, there was no proof of guilt beyond a reasonable doubt. Defendants conclude that the facts show Alexander's death to have resulted from acts that were reasonable under the circumstances.

Resolution of factual issues and the assessment of the credibility of witnesses is for the jury to determine (*People v. Williams* (1982), 93 Ill. 2d 309, 315, 444 N.E.2d 136, 138), and we will not reverse that judgment unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to guilt remains (*People v. Berland* (1978), 74 Ill. 2d 286, 306, 385 N.E.2d 649, 658).

The evidence established that Alexander was bludgeoned and shot in the motel room where his body was found. He was completely nude and had only been in the room for a short time before he was killed. Both defendants hastily left the scene after the shooting. Judy later attempted to conceal her bloody clothes and denied being in the motel. Holloway also initially denied being at the crime scene and hid the murder weapon in the ceiling of his home. Later, both defendants confessed, giving explicit details of the crime. We have already determined that the trial court did not err in refusing to suppress the confessions. Accordingly, the jury was free to consider *all* the evidence, including the confessions, in reaching a verdict. Even if the evidence is largely circumstantial, it does tend toward a satisfactory conclusion and produces a reasonable and moral certainty that defendants committed the crime. (*People v. Williams* (1982), 93 Ill. 2d 309, 322, 444 N.E.2d 136.) It is sufficient that if all the evidence taken together satisfies the jury beyond a reasonable doubt, then each link in the chain of events need not be proved separately beyond a reasonable doubt. (*People v. Williams* (1982), 93 Ill. 2d 309, 323, 444 N.E.2d 136.) We hold that the record supports the jury's verdict of guilty of murder as to both defendants.

■■ Both defendants argue that the trial court erred in refusing to give certain jury instructions. Holloway claims that the jury should have been given instructions on the justifiable use of force and voluntary manslaughter, since his defense was predicated on the theories that he acted in self-defense and in defense of Judy. Judy argues that the jury should have been given the non-Illinois pattern jury instruc-

tion that mere presence at the scene of a crime is insufficient to establish accountability.

The Criminal Code of 1961 defines voluntary manslaughter as follows:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1977, ch. 38, par. 9—2.)

The jury instructions that defendant Holloway attempted to tender are:

"(1) I.P.I. 24.06, Use of Force in Defense of a Person;

(2) I.P.I. 25.05, Issues in Defense of Justifiable Use of Force;

(3) I.P.I. 7.03, Voluntary Manslaughter—Provocation;

(4) I.P.I. 7.04, Issues in Voluntary Manslaughter—Provocation;

(5) I.P.I. 7.05, Voluntary Manslaughter—Intentional—Belief of Justification; and

(6) I.P.I. 7.06, Issues in Voluntary Manslaughter—Intentional—Belief of Justification."

It is well settled that if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction tendered by the defendant must be given. (*People v. Simpson* (1978), 74 Ill. 2d 497, 500, 384 N.E.2d 373, 374.) However, such an instruction should not be given if the evidence clearly demonstrates that the crime was murder and there is no evidence to support a conviction for manslaughter. *People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373.

Additionally, if there is some evidence in the record which, if believed by a jury, would support a claim of self-defense, then an instruction on justifiable use of force should be given. (*People v. Lockett* (1980), 82 Ill. 2d 546, 551, 413 N.E.2d 378, 381.) The jury would then

have the opportunity to consider whether the defendant subjectively believed that use of force was necessary, but that defendant's subjective belief was unreasonable under the circumstances. This conclusion would give rise to a verdict of voluntary manslaughter. Accordingly, instructions on justifiable use of force and voluntary manslaughter should be given when any evidence is presented showing defendant's subjective belief that use of force was necessary. (See *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378.) In determining whether Holloway was entitled to the voluntary manslaughter instructions, the record must be carefully reviewed in its entirety.

In the instant case, Holloway's entire defense was premised upon the theory that Alexander was killed when the gun discharged during a struggle—an accident. Holloway claimed not to have intended to kill Alexander. Further, the incident, which Holloway claims gave rise to the struggle (Alexander's attack upon Judy), was not such as would evoke the sudden and intense passion that follows serious provocation as defined by the voluntary manslaughter statute. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—2(a). See also *People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270; *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461.) Thus, it seems clear that Holloway's defense was totally inconsistent with the jury instructions he sought to give.

We also note that defendant Holloway's own testimony established that it was he who attacked Alexander. (See *People v. Gutierrez* (1979), 77 Ill. App. 3d 772, 396 N.E.2d 853.) Additionally, since none of the evidence suggested that Holloway knowingly used excessive force, it was not necessary to consider whether his subjective belief · was unreasonable for purposes of the voluntary manslaughter instruction. (See *People v. Lockett* (1980), 82 Ill. 2d 596, 413 N.E.2d 378.) A detailed review of the evidence established that Alexander met his death either as a result of a plan to kill him, which the jury found, or inadvertently during a struggle with Holloway, which the jury rejected when it found defendants guilty of murder. Under these circumstances there was no justification for giving the instructions on justifiable use of force and voluntary manslaughter. We conclude that the trial court did not err in refusing to give the jury the instructions in question. *People v. Gutierrez* (1979), 77 Ill. App. 3d 772, 774, 396 N.E.2d 853.

Judy complains that it was error for the trial judge to have refused her non-Illinois pattern jury instruction concerning mere presence at the scene of the crime. She relies on *People v. Fryman* (1954), 4 Ill. 2d 224, 122 N.E.2d 573, *People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622, and *People v. Nugara* (1968), 39 Ill. 2d 482,

236 N.E.2d 693, in support of her argument that even if there is only slight evidence relating to her theory she was entitled to the instruction on mere presence. While she correctly states the rule, our review of the record makes it clear that the minimum standard for giving the mere-presence instruction was not supported by the evidence. On the contrary, the evidence shows the trial judge correctly gave the Illinois pattern jury instructions concerning accountability.

Judy concedes that the accountability instruction was proper but asserts that in any event it should have been given in concert with the mere-presence instruction. Liability under the theory of accountability requires that the defendant, before or during the commission of an offense by another, aids or abets that other person. (Ill. Rev. Stat. 1977, ch. 38, par. 5—2; *People v. Fuller* (1980), 91 Ill. App. 3d 922, 929, 415 N.E.2d 502, 507.) While mere presence at the scene of a crime does not make a person a principal in the crime (*People v. Hunter* (1976), 42 Ill. App. 3d 947, 950, 356 N.E.2d 822, 824), the defendant's assistance during the crime can be inferred from his acts performed with the other party after the commission of the crime (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 929, 415 N.E.2d 502). Thus, the fact finder need not rely on the defendant's overt act of assistance in order to reach a verdict of guilty. (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 929, 415 N.E.2d 502.) Further, proof of a common purpose in finding defendant guilty on a theory of accountability need not be supported by words or action at the time of the crime but can be drawn from the surrounding circumstances. (*People v. Moon* (1976), 38 Ill. App. 3d 854, 862, 350 N.E.2d 179, 185.) The trier of fact may consider the defendant's conduct in connection with other circumstances in concluding that the defendant was not merely a bystander but aided and abetted the crime. *People v. McConnell* (1977), 48 Ill. App. 3d 355, 361, 362 N.E.2d 1280, 1286.

In this case, Judy's conduct before the killing, during the struggle, and afterward clearly established accountability. There was evidence that she and Holloway plotted to kill Alexander on more than one occasion. The eventual killing grew out of a plot between the two. Judy concealed her bloodstained clothing after fleeing the murder scene with Holloway. By their own confessions, Judy and Holloway engaged in sexual intercourse after the killing.

The requirements for accountability in this case were clearly satisfied, while the minimum standard under which a mere-presence instruction should be given was not. We find no error in the trial court's refusal to give Judy's non-Illinois pattern jury instruction concerning mere presence at the scene of the crime.

■ Defendant Holloway urges this court to reverse his conviction because of what he contends was the trial court's premature issuance of the *Prim*[1] instruction.[2] The State correctly points out that no specific amount of time is prescribed for a jury to deliberate before the *Prim* instruction can be given. It is within the function of the trial court to make that determination. (*People v. Preston* (1979), 76 Ill. 2d 274, 283, 391 N.E.2d 359, 363.) Further, the evidence was overwhelming, and we do not accept defendant Holloway's argument that their convictions resulted from the premature giving of the *Prim* instruction and not from the evidence.

We find no support in the record for defendant Holloway's contention, and his arguments do not explain how the jury was influenced or in any way pressured into reaching a verdict. We hold that there was no reversible error in the issuance of the *Prim* instruction.

■ Both defendants argue that the trial court abused its discretion in sentencing each defendant to a term of 40 years' imprisonment. Holloway points out that he had no prior felony convictions; he held a steady job and was a productive member of his community. He concludes that, all things considered, including his advanced age, his sentence should be reduced to 20 years.

Judy makes the argument that this court should view her sentence as excessive since she had no prior criminal record. She points out that she was an exemplary citizen before this incident and that she has strong rehabilitative potential. She asks that her sentence be reduced to 20 years.

We reject these arguments. It is well settled that sentencing is within the discretion of the trial court, and it will not be altered on review absent an abuse of that discretion. (*People v. Gutierrez* (1979), 77 Ill. App. 3d 772, 774, 396 N.E.2d 853, 855, citing *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The sentence imposed upon these defendants was within statutory limits and, considering the nature of the crime and all other circumstances (*People v. Gutierrez* (1979), 77 Ill. App. 3d 772, 774-75, 396 N.E.2d 882), we find no abuse of discretion.

---

[1]*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

[2]*Prim* outlined the standards under which the trial court, in exercising its discretion, may give supplemental instructions to a deadlocked jury. The court in *Prim*, following the American Bar Association Minimum Standards Relating to Jury Trials, outlined points on which the jury may be supplementarily instructed, while avoiding coercion of a guilty verdict.

314

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and ROMITI, J., concur.